IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

        Plaintiff,

   vs.

JOSEPH L. ANGELO, JR.,

        Defendant.

Criminal No.16-10323-FDS

## GOVERNMENT'S SENTENCING MEMORANDUM

The Government submits its sentencing memorandum for this Court's consideration in connection with the sentencing of Joseph L. Angelo Jr. on April 30, 2018.

## BACKGROUND

Defendant Angelo pleaded guilty to 11 counts of Wire Fraud in violation of 18 U.S.C. § 1343 in connection with his operation of Lease One Corp. ("Lease One"), also called Palmtree Finance and Funding ("Palmtree"), a company he represented to certain of the victim small business owners as a broker for obtaining loans and to other victim small business owners as a direct lender for loans.  Angelo executed his scheme to defraud small business owners who paid deposits ranging from $ 20,000 to $ 344,918 to him, aggregating $ 1,069,668, between November 2011 and March 2015.  Angelo made numerous false representations to further his scheme, including among others:

    a.   That the deposit would be held as a security deposit when, in fact, he immediately spent the deposits for his own uses;

    b.   That for some of the small businesses, he would himself immediately provide the requested loan funds through Lease One or Palmtree as the direct lender, when, in fact, he had neither the intention nor the capacity to have Lease One or Palmtree  provide the requested funds;

  c. That for the other small businesses, Lease One and Palmtree would immediately secure the requested funds from a third party lender when, in fact, he had neither the intention nor the capacity to secure the requested funds from a third party lender;

  d. That the deposit from the small business owner would be refunded if the loan was not funded when, in fact, he immediately spent the deposit for his own purposes and, further, he had neither the intention nor the capacity to refund the deposit;

  e. That the requested loan would be funded within a very short period of days after the deposit was paid and Angelo had conducted a site visit to the small business project when, in fact, although he took the deposit and made a purported site visit he had neither the intention nor the capacity to deliver or obtain the requested loan funds;

  f. To further his scheme with regard to the deposit he had taken from victim Jannett Gomez, Angelo -- without the knowledge or permission of Gomez -- used a forged signature in her name to submit an application for a loan in an amount far less than he had promised her and under extreme terms she could not afford;[1]

  g. When Angelo received complaints from the small business owners about delays and the lack of the funding he had promised, Angelo made additional fraudulent representations to the owners and principals of the small businesses, including but not limited to:

    1. That funding had been approved and was imminent, when, in fact, there had been no approval of funding and there were no funds available for funding of the requested loans; and

    2. That Lease One and Palmtree would refund the deposits if the small business owners executed a form called "REQUEST FOR REFUND" when, in fact, after the small business owners sent him the executed forms Angelo merely continued to make additional false promises,

---

 [1] Angelo had promised Jannet Gomez of Corona Drywall that his own Palmtree Finance & Funding, LLC would be the direct lender to provide a loan of $ 515,000.  Rather than promptly fund the $ 515,000 as promised, Angelo misled and delayed Gomez before he obtained only a $ 125,000 loan using a forged signature of Jannet Gomez.  That loan from a lender named Merchant Capital under outrageous terms required Corona Drywall to make *daily* payments. Because of Angelo's false promises, delays and refusal to refund her $ 32,250 deposit, Gomez was coerced to take the $ 125,000 loan to try to get by in hopes of obtaining additional funds elsewhere, but ultimately was forced to default on the Merchant Capital loan.

made false excuses for delays, and ultimately refused to respond to the small business owners.

Angelo never funded or secured funding for any of the requested loans and did not refund any of the deposits.

## THE REASONABLE AND APPROPRIATE SENTENCE

The PreSentence Report (PSR) has properly calculated the applicable sentencing guidelines (USSG §§) –

| | |
|---|---|
| Base Offense Level, § 2B1.1(a)(1) | 7 |
| Loss $ 1,169,568.69, § 2B1.1(b)(1)(H) | 14 |
| Substantial financial hardship to 5+ victims, § 2B1.1(b)(2)(B) | 4 |
| Unauthorized transfer/use of means of ID, § 2B1.1(b)(11) | 2 |
| Adjusted Offense Level | 27 |
| Acceptance of Responsibility, § 3E1.1(a),(b) | - 3 |
| Total Offense Level | 24 |

The corresponding sentencing guidelines range is a period of incarceration for 51 to 63 months, to be followed by a term of up to 3 years of supervised release, together with a special assessment of $ 1,100.00.  The PSR reflects, and the Government requests an Order for, restitution in the amount of $ 1,164,568.69.  This restitution amount does not include $ 13,444 in attorney fees for victim Michael Curry (Curry Land Development).  See, PSR p. 33-34.  The Government does not press for restitution regarding the attorney fees in this instance: (1) in light of the amount of restitution requested among all victims, and (2) where restitution for attorney fees has not been calculated or requested as to other victims. [2]

---

[2] This Court, on January 2, 2018, entered an Order of Forfeiture in the amount of $ 1,069,568.69.  Docket No. 53.

The defendant's conduct extended over a period of 52 months, during which time the defendant carried out a continuing and intentional scheme to defraud at least 10 vulnerable small business owners. To fraudulently obtain over $ 1 million dollars from his victims, Angelo used multiple false promises, bogus claims of ability to personally fund loans, fabricated claims of ability to obtain third party loans and untrue assurances that deposits would be refunded if the loans were not funded. Despite having immediately spent the deposits for his own uses and that he knew the victims would never receive the funds he promised them, he maliciously delayed victims by reassuring them their deposits would be refunded. When victims complained about delays, he stalled them further with claims that the funds were approved and would be released within days and with sympathetic assertions that he was hindered by the death of one or another family member. When pressed further, Angelo went so far as to send victims a so-called "REQUEST FOR REFUND" with the intentionally fraudulent assurance that the form would provide an immediate refund of their deposits. In at least one instance, Angelo enlarged his fraudulent scheme by committing identity theft with the use of a forged signature. The ruses and lies used by Angelo – ongoing over a period of more than 4 years ! -- represent nothing less than premeditated crimes he knew would cause devastating harm to multiple small business owners. *See* PRS §§ 30 – 37.[3]

---

[3] The PSR at ¶¶ 30 – 37 details specific impacts on 7 of the 10 victims based on reviews of complaints filed against Angelo in civil suits won by the victims [of which the defense is obviously fully aware] and interviews of victims conducted by the FBI. It is disingenuous for the defendant to claim he was not aware of or did not have an opportunity to rebut claims of "substantial financial hardships" set out in the PSR. *See* Defense belated objections to the PSR, Docket No. 58 at 3. The Probation Department has correctly presented the facts and correctly determined that the enhancement under USSG 2B1.1(b)(2)(B) for causing substantial financial hardship to five or more victims applies. *See* PSR at ¶ 45.

The PSR at ¶ 32 queried how Angelo's defrauding Clean It Bright caused owner Tray Rorie to lose his $ 2.5 million business. The FBI conducted further interviews to respond, including of Sean Farrell who helped connect Rorie with Angelo. Rorie needed to borrow

In light of Angelo's long-running, repetitive and malevolent scheme to fraudulently garner over $ 1 million, a sentence of 54 months incarceration (4 and ½ years) is the appropriate prison sentence in this case.

Moreover, the sentencing guidelines are intended to represent a leveling of sentences among similarly situated defendants.  The guidelines have been correctly calculated in this case. Under Section 3553 review, there is neither a legal nor a factual basis to support a departure (Chapters 4, 5) or a variance (§ 3553) from the applicable guidelines range.

Under the facts of Angelo's egregious criminal conduct, particularly with application of the sentencing guidelines, a sentence of 54 months incarceration, supervised release for a period of 3 years, a special assessment of $ 1,100 and an Order for restitution of $ 1,069.568.69 is the entirely reasonable and appropriate disposition in this case.

## THE DEFEND'S CLAIMS FOR A LENIENT SENTENCE

The PSR contains a factual and legal discussion regarding the application of a 2-level enhancement under USSG §  2B1.1(b)(11) for the unauthorized transfer or use of a means of identification to unlawfully produce or obtain another means of identification.  *See* PSR at ¶¶ 27-28, 45 and analyses at pp. 34, 35.  The enhancement applies in this case because Angelo used the forged signature of Jannett Gomez to obtain a loan from Merchant Capital.    In his belated Objections To Presentence Report, Docket No. 58, the defendant objects to application of the 2-

---

$ 350,000 to purchase and install equipment for his self-storage business.  In order to pay the $ 24,500 deposit to Angelo and operate the business in anticipation of the $ 350,000 loan Angelo promised, Rorie took out a $ 100,000 operating loan against the business.  When Angelo delayed and ultimately failed to provide the $ 350,000 loan or refund the deposit. Rorie was left to pay for the commercial equipment on his own.  Without the funds Angelo promised, the business was left with no operating capital and Rorie was unable to repay the operating loan.  As a result, the business failed.  Rorie not only lost his business, he was forced to sell his family farm to repay the operating loan.

level enhancement   *See* Defendant's Objections at 1-3.  His arguments are contradicted by the

facts and otherwise unsupported.  First, the defendant improperly suggests to this Court that the

signature of Jannett Gomez may not have been forged at all.  *Id.* at 1.  It is beyond cavil that the

defendant has known from the outset, from his own conduct as well as his personal discussions

with Kortney Murray and victim Jannett Gomez, that Jannett Gomez did not authorize him to

apply for a $ 125,000 loan from Merchant Capital and neither knew or authorized that he used

her signature on such a loan application in her name.  The civil suits, criminal investigation,

Indictment, and factual presentation in the PSR merely confirmed what Angelo knew from the

outset.  Second, he argues that the enhancement should not apply to him because the victim

ultimately received the loan.  This is sophistry because his unauthorized use of her signature was

in the course of his scheme to defraud her.  She did not authorize and was not aware of what

Angelo was doing at the time he fraudulently used her identity – name, date of birth, social

security number and signature -- to obtain a loan.  That Angelo's delays and lies forced her to

later complete the loan in an unsuccessful effort to keep her business alive does not vitiate his

fraudulent use of her identification.  Angelo cannot force his victim to comply with his fraud,

then deny his culpability.  Third, the defendant asserts that there is "no proof" that he was

involved in the creation or use of the forged signature of Jannett Gomez.  His assertion is belied

by the facts.  Kortney Murray was a former employee of Angelo's Lease One Corp. before

starting her own loan broker company.  She stated that a few years later Angelo solicited her

assistance in trying to obtain a loan in the name of Jannett Gomez.  More specifically, Angelo

insisted that Murray not contact Jannett Gomez herself and he delivered to Murray the signed

(forged) loan application used to obtain the Merchant Capital loan.  When Gomez was ultimately

unable to pay the loan, Murray contacted Gomez and learned, among other false representations

by Angelo, that the signature on the loan application Angelo gave to Murray was a forgery.

Fourth, Angelo argues without any support for the proposition that if he did not profit personally

from the fraudulent use of the identity, he cannot be held accountable under the guidelines.  His

argument is a non-starter on two bases: (a) the defense cannot deny that a defendant can aid and

abet the fraudulent use of identity where another person receives the benefit, and (b) in this

instance, Angelo did personally benefit from his fraudulent use of Jannett Gomez's

identification.  Murray stated that the Merchant Capital loan generated a $ 9,000 broker

commission, which she split 50/50 with Angelo.  Furthermore, when Gomez defaulted on the

loan and Merchant Capital learned the loan was fraudulent, the lender demanded its commission

be returned by Murray.  Murray contacted Angelo to return his $ 4,500 share but was rebuffed by

his bogus claim that his mother was dying.  Thus, Angelo did, in fact, profit from the fraudulent

use of Jannett Gomez's identification.  Fifth, the defendant appears to argue that creating a new

loan is not "another form of identification.  He is simply wrong, as set out in the Government's

analysis of the facts and law at page 34-35 of the PSR.  For instance, Application Note

10(C)(ii)(I) to § 2B1.1 provides the specific example of an individual's name and social security

number being used to obtain a bank loan in that individual's name, thus "the account number of

the bank loan is the other means of identification that has been obtained unlawfully"  *See also*,

*United States v. Williams*, 355 F.3d 893 (6th Cir. 2003)(use of identity to obtain bank loan; bank

loan number is a new means of identity).  Angelo's attempt to distinguish *Williams* on his naked

declaration that the principle applies only where he used the identification to obtain a loan in his

own name is contradicted by the very terms and intent of the enhancement itself, *viz.*, to punish

the defendant's fraudulent use of the identity of another.

Next, the defendant does not contest the facts, but nonetheless objects to, the application of the 4-level enhancement under USSG § 2B1.1(b)(2)(B) for his causing substantial financial hardships to five or more of his victims.  Defendant's Objections to Presentence report at 3.  As discussed above, in light of the numerous civil actions successfully pursued against Angelo by multiple victims, he cannot claim he was not sufficiently informed of the financial losses and concomitant impacts suffered by his victims.[4]  Moreover, his criminal attorney was also Angelo's attorney for the various civil suits.  Finally, the FBI conducted interviews to supplement the evidence of the financial hardships Angelo's fraudulent scheme caused.  The enhancement clearly applies in this case.

Angelo fares no better in his Sentencing Memorandum and Request For Downward Departure, Docket No. 57.  First, the cases he cites to seek a lenient sentence from this Court are inapposite to Angelo's sentencing.  Representative examples will suffice.  *Prosperi* [5] is the only fraud case, and there Judge Stearns determined that the loss calculation in the PSR was at best imprecise and not controlling, where loss for inferior concrete for the Big Dig project had been calculated by foot of tunnel completed rather than amount of the concrete purchased.  More importantly, Judge Stearns specifically emphasized that there was no proof of actual harm, that there was no proof of intended harm, and indeed the defendants never personally enriched themselves through their crime.  Judge Stearns also considered it significant that one defendant's wife was dying of terminal cancer and the co-defendant's daughter was "badly disabled."  None of the factors in *Prosperi* have any application to this case.  On the contrary, loss is precisely and

---

[4]  Although there are multiple large judgments against Angelo, it appears that only one victim has recovered a paltry $ 5,000 by seizing a bank account.  This is confirmed in PSR ¶ 38.

[5]  *United States v. Prosperi*, 686 F.3d 32 (1st Cir. 2012).  The factual references listed above are at pages 44, 46, 48-49.

accurately calculated, Angelo intended and did cause very real harm to his victims, and he immensely enriched himself personally.

*Roselli* [6]involved a tax case where the applicable guidelines range was only 6 to 12 months.  Judge Woodlock merely departed downward to 12 months of home confinement.  More importantly, he did so because the defendant had four children, two of whom had cystic fibrosis that required nearly round-the-clock care and the defendant's wife had significant medical conditions herself.  Another consideration for the court was an attempt to avoid having the defendant deported.  Again, nothing in *Roselli* has application to this case.

Angelo cites *Martin* for the proposition that the sentencing court "may not mechanically assume" that the guidelines sentencing range "frames the boundaries of a reasonable sentence in every case."  This tautology applies, but the same *Martin* court declared that the district court should not "casually" use the "raw power to deviate" and that larger deviations require "more significant justification[s]" than smaller ones."

Next, Angelo attempts to paint himself as an "atypical" offender, relying on a lack of prior criminal history and that he has "resumed leading a law-abiding life, thereby justifying a departure."  Defendant Sentencing Memorandum at 6.  On the contrary, everything cited by the defendant is rather "typical" of a fraud artist.  It is more "typical" than not that a defendant convicted of fraud has not been previously convicted.  Fraud offenses do not "typically" involve career offenders or violent crimes.  In any event, in *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir 2006) the court explained the strong importance of punishing white-collar offenders, declaring that "It is impermissible for a court to impose a lighter sentence on white-collar

---

[6] *United States v. Roselli*, 366 F.3d 58 (1st Cir 2004).  Specific references above are found at pages 64, 68, 70.

defendants . . . because it reasons that white-collar offenders suffer greater reputational harm or have more to lose."  The Government agrees that Angelo operated his own small business; but he used that small business to defraud numerous other small businesses.

The defendant claims that he "suffers from a gambling addiction. And sought treatment." There is little evidence of an "addiction" and scant evidence of "treatment."  The court in *Martin* made clear that the sentencing court is not required to take the defendant's claims of rehabilitation at face value, quoting *United States v. Bogdan*, 284 F3d 324, 330 (1st Cir. 2002)("It is not uncommon for defendants to discover the virtues of introspection and remorse when facing the threat of punishment.")  Moreover, the Government has traced Angelo's uses of funds from the defrauded victims in the Indictment.  While there were indeed some funds paid to Foxwoods, funds were largely used by Angelo in other ways:

| DEPOSIT | SAMPLE WITHDRAWALLS |
|---|---|
| Deer Valley $ 344,918 | IRS $ 31,927; Angelo $ 35,018, Foxwoods $ 3,107 |
| Southwest Wind $ 271,000 | Attorney for Canadian Communications $ 50,000[7]<br>Bahamas Offshore Ship Service $ 52,660<br>Angelo $ 21,819, Foxwoods $ 3,107 |
| Jimmy's $ 77,604 | Angelo $ 33,000, U.S. Treasury $ 1,113 |
| Sunrise $ 131,033 | Foxwoods $ 75,000, Angelo Realty Trust $ 11,500 |
| Clean It Bright $ 24,500 | Cash $ 19,309, Angelo $ 2,000 |

---

[7] Canadian Communications is another, uncharged, victim of Angelo's fraud scheme, predating the statute of limitations in the present Indictment.  Canadian Communications had filed a civil suit against Angelo's Lease One Corp. for the same conduct, occurring in 2009-2010 and obtained a judgment of $ 50,000 plus costs and interest of $ 4,524.12.  Lease One paid the plaintiff's attorney $ 50,000 on 3/16/2012 from the Southwest Wind deposit.

Healthcare of Florence LLC involved another pre-statute of limitations instance where the borrower filed a civil suit against Lease One Corp for similar fraud, obtaining a judgment of $ 37,500 plus costs of $ 1,500 in state court in Idaho.  It appears that the judgment is unpaid.

| Bill Goodwin $ 60,188 | Chambers Law $ 10,000, Cash $ 17,900, Angelo $ 6,079 |
| G&G Hot Dogs $ 17,074 | Angelo $ 8,000, Cash $ 6,110, Steven Angelo $ 599 |
| Curry Land Dev. $ 30,000 | LSS LLC $ 21,123, Salem State Univ. $ 3.595, Cash $ 3,200 |
| Corona Drywall $ 33,250 [ | Cash $ 15,600 |
| Amer. Trucking $ 80,000 | East Bost Savings Bk (Angelo Mortgage) $ 37,101, Cash $ 25,500 Foxwoods $ 10,042 Angelo Realty Trust $ 4,600 |

Nothing submitted by Angelo places him outside the heartland of a "typical" con artist.

Angelo claims this Court should not impose any financial penalties in the form of fines or restitution because of his asserted inability to pay.  He claims that this Court should treat as a priority "his ability to support himself and his family in the future" and that future social security payments "are meant to help a person [i.e., Angelo] survive."  He throws in the off-hand comment that ordering him to make restitution may in some unspecified way "violate his Eighth Amendment right to be free of cruel and unusual punishment."  Defendant's Sentencing Memorandum at 7.

Of course, wholly apart from the fact that his self-centered claims seek to ignore the harm he intentionally caused others, restitution is not only "usual" punishment in fraud cases it is indeed mandatory in offenses of the type for which Angelo has pleaded guilty.  The Government is aware that on March 18, 2008, Angelo and his wife purchased a house at 29 Hilltop Avenue, Saugus, MA.  The property was purchased in the name of Angelo Realty Trust, with Angelo and his wife as trustees.  On December 9, 2015, while civil suits were pending and the defendant knew he was under federal criminal investigation, his wife signed documents to remove Angelo

as trustee and appoint their son, Steven, as trustee.  On the same day, his wife signed a Purchase & Sale Agreement to sell the house.  On January 29, 2016, seller Angelo Realty Trust received a check for $ 189,191.87 that was made payable to Angelo's wife.  An additional $ 50,000 check was disbursed from the closing to Mr. Chambers, Angelo's attorney.  Even if Angelo has no access or control over funds today, an Order of Restitution is necessary in the event future activities, such as gambling, provide significant funds to Angelo.

The Government does not oppose the defendant's request to self-surrender nor his request for a court non-binding recommendation that the Bureau of Prisons assign him to FMC Devens.

## CONCLUSION

The Sentencing Guidelines have been correctly calculated by the U.S. Probation Office. The applicable sentencing guidelines range is 51 to 63 months.  There is neither a legal nor a factual basis for departure or variance from the applicable guidelines range.  The defendant's factual assertions intended to support a reduced sentence are, at best, incorrect.

A sentence of 54 months of imprisonment, together with 3 years of supervised release and Special Assessments aggregating $ 1,100 should be imposed.  Restitution is required and an Order of restitution in the amount of $ 1,069,568.69 should be entered.

Respectfully submitted this 20th day of April, 2018.

ANDREW E. LELLING
United States Attorney

By:  */s/ Victor A. Wild*
VICTOR A. WILD
Assistant U.S. Attorney

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Victor A. Wild*
VICTOR A. WILD
Assistant U.S. Attorney
Suite 900
One Courthouse Way
Boston, MA
Victor.wild@usdoj.gov
